UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| ARRAY PETROLEUM, LLC | CIVIL ACTION |
| VERSUS | NO: 24-02867 |
| NATURAL RESOURCES WORLDWIDE, LLC | SECTION: T (5) |

## ORDER AND REASONS

Before the Court is a Motion for Temporary Restraining Order and Order to Show Cause for Preliminary Injunction filed by Plaintiff Array Petroleum, LLC. R. Doc. 3. Defendant Natural Resources Worldwide, LLC, has filed a response in opposition. R. Doc. 8. The parties have filed various supplemental memoranda and replies. See R. Docs. 12, 14, and 15. For the reasons set forth below, the Court will deny the Motion for a Temporary Restraining Order. However, the Court will permit a hearing on the Preliminary Injunction, which the Court sets for January 22, 2025, at 10:00 a.m.

BACKGROUND

In its Complaint, R. Doc. 1, Plaintiff asserts Defendant entered into a purchase and sale agreement on February 9, 2024, that would grant Defendant hydrocarbon producing assets on the Outer Continental Shelf then-owned by certain companies affiliated with bankruptcy debtor Cox Oil Offshore, LLC (generally "Cox" or "Cox Assets"). Cox remains the federal lessee of record

1

until the sale is finalized, but Defendant has been designated the authority to extract hydrocarbons until then. On February 1, 2024, Plaintiff and Defendant entered into an Offshore Contract Operating Agreement related to certain of the Cox Assets. This Operating Agreement is the contract under review in this case.

According to Plaintiff, it is the "Designated Operator of Record" for the subject leases and assets with the United States Bureau of Ocean Energy Management. As such, Plaintiff claims it is responsible for all financial and environmental regulatory obligations to the United States Government under the Outer Continental Shelf Lands Act. Plaintiff also asserts that, under the Operating Agreement, it – and presumably no other -- was required to negotiate the sales of all hydrocarbons produced, to account for all revenue, and to distribute the revenue. Thus, Plaintiff contends, all revenue from the sale of the hydrocarbons produced was to be accounted for and distributed by Plaintiff. *See* R. Doc. 1, p. 3. In its present Motion, Plaintiff seems to argue the contract provided for it alone to receive the revenue, which it would then account for and then distribute.[1] Plaintiff also asserts that Defendant must compensate it with respect to services rendered in accordance with the compensation schedule set forth in the Operating Agreement and that Defendant must pay undisputed invoices within 60 days of receipt (with Defendant allowed 30 days in which to contest any invoice).

Instead of Plaintiff arranging for the sales of the hydrocarbons, Defendant contracted with

---

[1] Defendant disputes this, pointing out that the Operating Agreement allows for it to determine what services the Operator, Plaintiff, would provide.

CIMA Energy, LP, to sell the hydrocarbons and then direct all revenues to Defendant. Plaintiff contends Defendant has breached the Operating Agreement by refusing to cede to Plaintiff the management, disbursement, and accounting of the revenue. Instead, Plaintiff asserts, Defendant has diverted the revenue to its own account and repeatedly failed to pay invoices timely. Consequently, Plaintiff alleges, it has not received sufficient funds to pay Plaintiff its fee, the bills from subcontractors, or the royalties due the United States.

Since February of 2024, Plaintiff has submitted invoices to Defendant for payment, which Defendant then paid from the revenue it received from CIMA. This system has continued, though in November 2024, Plaintiff placed Defendant on notice that Defendant had violated the Operating Agreement for not paying the invoices timely or to comply with the Operating Agreement's requirement that Plaintiff as the Designated Operator is the proper entity to manage, account for, and disburse revenue, payments, and royalties. Plaintiff contends that Defendant has received some $78,000,000 in revenue, but Defendant has disbursed only about $48,000,000 to pay Plaintiff's invoices and those of the subcontractors. Plaintiff speculates that on a monthly basis some 2 to 3 million dollars is left unaccounted for by Defendant. Plaintiff alleges that Defendant has failed to pay Plaintiff some $2.5 million, the subcontractors some $10.7 million, and the United States nearly $12 million.

What brings this matter to a head is that Plaintiff contends the next distribution of revenue from the sale of the hydrocarbons is due to be received by Defendant on December 20, 2024. Plaintiff asserts the subcontractors are beginning to walk off the job for non-payment and that

Defendant, by not ceding the revenue to Plaintiff, has interfered with Plaintiff's ability to serve as the Designated Operator and to fulfill its obligations under the Operating Agreement. In its *ex parte* Motion for a Temporary Restraining Order, Plaintiff specifically asserts: "Plaintiff has substantiated fears that given proper notice the following will occur: (1) CIMA Energy, LP and/or other third-party oil and gas marketers will send hydrocarbon revenue with respect to hydrocarbons produced from the Assets beginning February 14, 2024 and going forward, to accounts controlled and operated by [Defendant] before this matter can be heard at a scheduled hearing; (2) the revenue from the sale of the hydrocarbons with respect to hydrocarbons produced from the Assets beginning February 14, 2024 and going forward, by CIMA Energy and/or other third party oil and gas marketers will be transferred to accounts owned and operated by [Defendant] on or around December 20, 2024; (3) required notice as outlined in the Federal Rules of Civil Procedure will allow [Defendant] to misappropriate revenue funds that are already contractually required to be controlled and [under the] management of [Plaintiff]. The detailed Complaint, attached exhibits, declarations, above memorandum, and [Defendant's] documented pattern of paying [Plaintiff] and its subcontractors less than the amount owed also support [Plaintiff's] conclusions that should proper notice be given to [Defendant], [Plaintiff] will have no equitable remedy under the law." [2]

---

[2] The Court was alerted after the filing of Plaintiff's *ex parte* Motion that Defendant intended to file a response to the Motion, which the Court then ordered be filed pursuant to expedited consideration granted on Plaintiff's request. R. Doc. 5. Accordingly, the Court need not determine whether a TRO should have issued without notice to the adverse party under Fed. Rule Civ. Pro. 65(b)(1). Under that Rule, a court may issue a temporary restraining order without written or oral notice to the adverse party or its attorney only if: (A) specific facts in an affidavit

Accordingly, Plaintiff seeks a temporary restraining order to be issued against Defendant and all of its affiliates, predecessors, successors, assigns or insurers, and all of its present or former officers, directors, employees, agents, administrators, or representatives: "(1) enjoining it and prohibiting it from receiving and misappropriating hydrocarbon revenue expected from third party oil and gas marketer CIMA Energy, LP and any other third party oil and gas marketer with respect to hydrocarbons produced from the Assets beginning February 14, 2024 and going forward, and (2) directing [Defendant] to comply with its obligations under the Operating Agreement and instruct CIMA Energy, LP and any other third party oil and gas marketers to provide all hydrocarbon sale revenue to [Plaintiff] with respect to hydrocarbons produced from the Assets beginning February 14, 2024 and going forward, and (3) directing [Defendant] not to disperse, dispose of, or otherwise transfer from its financial and/or bank accounts any revenue in [Defendant's] possession or control with respect to hydrocarbons produced from the Assets beginning February 14, 2024." R. Doc. 3-1.

LAW and ANALYSIS

Temporary restraining orders and preliminary injunctions are extraordinary forms of relief and require the plaintiff to carry "an onerous burden." *Clark v. Prichard*, 812 F.2d 991, 993 (5th Cir. 1987). Temporary restraining orders function to preserve the status quo by preventing

---

or a verified complaint clearly show that immediate and irreparable injury, loss, or damage will result to the movant before the adverse party can be heard in opposition; and (B) the movant's attorney certifies in writing any efforts made to give notice and the reasons why it should not be required.

irreparable harm until the preliminary injunction hearing. *Granny Goose Foods, Inc. v. Bhd. of Teamsters & Auto Truck Drivers Local No. 70*, 415 U.S. 423, 439 (1974). It is well-settled that to obtain a temporary restraining order, the movant must demonstrate all four of the following elements: (1) a substantial likelihood of prevailing on the merits; (2) a substantial threat of irreparable injury if the injunction is not granted; (3) the threatened injury outweighs any harm that will result to the non-movant if the injunction is granted; and (4) the injunction will not disserve the public interest. *Ridgely v. Fed. Emergency Mgmt. Agency*, 512 F.3d 727, 734 (5th Cir. 2008). A temporary restraining order is not warranted when the movant fails to demonstrate irreparable injury. *See, e.g., Sanders v. Nat'l Missionary Baptist Convention of Am.*, 2012 WL 12874264, at *1 (E.D. La. Oct. 3, 2012). "Ultimately, temporary restraining orders are extraordinary relief and are rarely issued." *Id.* (cleaned up). The decision to grant or deny a temporary restraining order, like that of a preliminary injunction, is within the sound discretion of the district court. *See Miss. Power & Light Co. v. United Gas Pipeline Co.*, 760 F.2d 618, 621 (5th Cir. 1985). The party requesting a temporary restraining order must clear the high hurdle of showing that it meets the requirements of Rule 65(b) and the four-element standard. *Cajun Services Unlimited, LLC v. Benton Energy Service Company*, 2020 WL 10486334 (E.D. La. Oct. 16, 2020).

After reviewing the briefs, affidavits in support, and the applicable law, the Court finds that Plaintiff has failed to show that the issuance of a temporary restraining order is appropriate under the substantive law.

First, Plaintiff has not demonstrated a substantial likelihood of prevailing on the merits.

This is a contract dispute, and both sides agree there is no ambiguity in the contract. Plaintiff essentially asserts that, under the Operating Agreement it alone, as the Designated Operator, has the right to market the hydrocarbons, collect the revenue, and then account for and disburse those revenues, including royalties to the United States. It is true that the Operating Agreement does include marketing of the hydrocarbons as one service to be provided; however, as Defendant points out, the Operating Agreement gives Defendant the authority to determine which services it wants Plaintiff to provide. Defendant, instead of instructing Plaintiff to provide marketing, accounting, and disbursement services, contracted from February 2024 with a third party to market the hydrocarbons and also chose to account for and disburse the funds itself. Plaintiff went along with that arrangement, submitting invoices to Defendant without complaint, until November 2024. There is clearly a genuine dispute as to whether Defendant breached the Operating Agreement in choosing to confect that arrangement. Accordingly, Plaintiff cannot show a substantial likelihood of prevailing on the merits.

More obviously, Plaintiff has failed to make a showing of a substantial threat of irreparable harm. As Defendants argue, this case is ultimately a contractual dispute over money and whether Plaintiff has timely received funds it was due under the Operating Agreement. Defendant points out that it has negotiated with the United States separately with regard to any royalties owed and that it has also communicated with the subcontractors and their outstanding demands. Defendant clearly seeks to continue operations and production from the Assets. The cases relied upon by Plaintiff are inapposite. The Fifth Circuit has repeatedly held that a preliminary injunction is an

inappropriate remedy where the potential harm to the movant is strictly financial. *Atwood Turnkey Drilling, Inc. v. Petroleo Brasileiro, S.A.*, 875 F.2d 1174 (5th Cir. 1989). Here, Plaintiff has not shown to this Court's satisfaction that it will be ultimately forced into bankruptcy or to close its doors if an injunction does not immediately issue. Any damages to Plaintiff as a result of Defendant's alleged actions may be remedied monetarily.

Similarly, Plaintiff has failed to show that the threatened injury outweighs any harm that will result to the Defendant if the injunction is granted. While Plaintiff asserts that failure to issue the injunction could result in its bankruptcy, Defendant points out that precluding it from access to its own funds and preventing it from disbursing those funds as it sees fit, could also negatively impact its own business and result in bankruptcy. Thus, there could be significant harm to Defendant were the Court to enjoin it from receiving funds it is otherwise due under the Operating Agreement.

Finally, Plaintiff has not demonstrated that granting the injunction will not disserve the public interest. The Court finds that, not only would the requested temporary restraining order mandate Defendant to forego its revenue, but also to turn that revenue over to Plaintiff to account for and disburse. It is not a matter of maintaining the status quo, but instead to realign the obligations and duties of the parties under the contract between them.

Although the Court finds that a temporary restraining order is not warranted, Plaintiff also seeks a hearing on its request for a preliminary injunction.

Accordingly,

**IT IS ORDERED** that the Motion for a Temporary Restraining Order is DENIED.

**IT IS FURTHER ORDERED** that the Rule to Show Cause be set for a hearing on January 22, 2025, at 10:00 a.m.

New Orleans, Louisiana, this 20th day of December 2024.

_____
GREG GERARD GUIDRY
UNITED STATES DISTRICT JUDGE